1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PAUL DAVID JOHNSON,                          No.  2:15-cv-1313 TLN KJN P

12                   Plaintiff,

13          v.                                     ORDER AND FINDINGS AND
                                                   RECOMMENDATIONS
14   J.A. BEARD, et al.,

15                   Defendants.

16

17   I.  Introduction

18          Plaintiff is a state prisoner, proceeding in forma pauperis and without counsel.  Pending

19   before the court is plaintiff's motion to add evidence, as well as his amended complaint.

20   II.  Motion to Add Evidence

21          Plaintiff requests that the court consider an exhibit as evidence in connection with these

22   proceedings.  The exhibit is a toxicology and drug monitoring result from serum toxicology

23   performed on or about March 15, 2017, concerning the arsenic level in plaintiff's blood.  (ECF

24   No. 17 at 2.)  Good cause appearing, plaintiff's motion is granted.

25   III.  Background

26          On December 13, 2014, while housed at San Quentin, plaintiff signed and filed a civil

27   rights complaint in the Northern District of California, and the court identified plaintiff's claims

28   as follows:

plaintiff alleges that the prison system delayed in diagnosing and treating his prostate cancer. According to the complaint, plaintiff has been transferred many times. His claims arise out of the medical treatment he received at High Desert State Prison ("HDSP") from 2000 to 2004 and during a short period in 2014, at California State Prison, Solano ("CSP-SOL") from 2005 to 2012, at the Correctional Training Facility in Soledad ("CTF") for three months in 2010, and at the Deuel Vocational Institution ("DVI") from 2012 to 2014.

Johnson v. Thuddy, No. 3:14-cv-04958-JST (N.D. Cal.) (ECF No. 13 at 1.)[1]  The court found the complaint contained deficiencies requiring amendment, one of which was allegations against nine defendants pertained to claims arising in the Eastern District of California. Id. at 3.[2]  Therefore, on April 17, 2015, the claims against defendants at High Desert State Prison ("HDSP"), California State Prison at Solano ("CSP-Sol"), and Deuel Vocational Institute ("DVI") were dismissed without prejudice to filing an action in the Eastern District. Id.[3]

On June 16, 2015, under the mailbox rule, plaintiff filed a complaint in the instant action, renewing his claims that various prison doctors denied him medical treatment, and now adding claims asserting that prison officials deliberately allowed the water to become contaminated with high levels of arsenic.  In addition to the nine defendants named in the Northern District complaint, plaintiff named an additional 11 defendants employed at various prisons.  The undersigned found that plaintiff failed to allege sufficient facts to allow the court to conclude his claims were plausible, and dismissed the complaint, but granted plaintiff leave to file an amended complaint.

---

[1]  A court may take judicial notice of court records.  See, e.g., Bennett v. Medtronic, Inc., 285 F.3d 801, 803 n.2 (9th Cir. 2002) ("[W]e may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (internal quotation omitted).

[2]  The nine defendants were Dr. Rohlfing (HDSP), Dr. Kreitler (HDSP), Dr. Filice (CTC (Susanville)), Dr. Chen (CSP-SOL), Dr. Collinsworth (CSP-SOL), Dr. Acquva (HDSP), Dr. Traquina (CSP-SOL), Dr. Kim (DVI), and Dr. Win (DVI).

[3]  Meanwhile, plaintiff's claims against P.A. Crammer and Dr. Chudy, erroneously sued as Dr. Thuddy, arising from plaintiff's treatment in 2009 while housed at the California Training Facility - Soledad ("CTF"), proceeded in the Northern District of California. Id.  On June 28, 2017, plaintiff's claims against Dr. Chudy, which accrued no later than September 3, 2009, were dismissed as barred by the statute of limitations. Id. (ECF No. 49.)

IV. <u>Amended Complaint</u>

    A. <u>Plaintiff's Allegations</u>

    Plaintiff again alleges that defendants were deliberately indifferent to plaintiff's serious medical needs. (ECF No. 15 at 23 (second cause of action).) Further, plaintiff raises a state law claim that the following defendants were negligent in their medical treatment of plaintiff in violation of California Civil Procedure § 340.5: Dr. Rohlfing, Dr. Filice, Dr. Kreitler, Dr. Kraft, Dr. Acquva, Dr. Naku, Dr. Mahmoud, Dr. Chen, Dr. Traquina, Dr. Collinsworth, Dr. Win, and Dr. Zheng. (<u>Id.</u> (first cause of action).) Plaintiff alleges that defendants Secretary Beard, Warden Runnels, Warden Swarthout, Warden J. Price, and Correctional Plant Managers J. Stanley and V. Millard were deliberately indifferent to unsafe prison conditions by allowing high levels of arsenic in the water at various prisons. (<u>Id.</u> (third cause of action).) Finally, plaintiff raises a state law claim that defendants failed to warn plaintiff of the unsafe conditions of the water in violation of California Code of Civil Procedure §§ 335.1, 337.1, 338(a), and Proposition 65. (<u>Id.</u> (fourth cause of action).)

    B. <u>Screening</u>

    As plaintiff was previously informed, the court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1),(2).

    A district court must construe a pro se pleading "liberally" to determine if it states a claim and, prior to dismissal, tell a plaintiff of deficiencies in his complaint and give plaintiff an opportunity to cure them. <u>See</u> <u>Lopez v. Smith</u>, 203 F.3d 1122, 1130-31 (9th Cir. 2000) ("[A] judge may dismiss [in forma pauperis] claims which are based on indisputably meritless legal theories or whose factual contentions are clearly baseless."). While detailed factual allegations are not required, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Bell</u>

3

Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Plaintiff must set forth "sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at

678 (quoting Bell Atlantic Corp., 550 U.S. at 570).

> A claim has facial plausibility when the plaintiff pleads factual
> content that allows the court to draw the reasonable inference that
> the defendant is liable for the misconduct alleged. The plausibility
> standard is not akin to a "probability requirement," but it asks for
> more than a sheer possibility that a defendant has acted unlawfully.
> Where a complaint pleads facts that are merely consistent with a
> defendant's liability, it stops short of the line between possibility
> and plausibility of entitlement to relief.

Iqbal, 556 U.S. at 678 (citations and quotation marks omitted).  Although legal conclusions can

provide the framework of a complaint, they must be supported by factual allegations, and are not

entitled to the assumption of truth.  Id. at 1950.

Exhibits appended to a complaint are a part thereof for all purposes.  See Fed. R. Civ. P.

10(c); see Wilhelm v. Rotman, 680 F.3d 1113, 1116 n.1 (9th Cir. 2012) (exhibits attached to the

complaint may be considered to decide whether dismissal is proper); Iqbal, 556 U.S. at 678

(2009) (conclusory allegations not supported by factual allegations do not state a plausible claim).

C. Unsafe Prison Conditions

1. Improper Joinder

Plaintiff's claims against the nine doctors in the original complaint filed in the Northern

District were based on the alleged delay in diagnosing and treating his medical conditions,

including prostate cancer, which the Northern District dismissed without prejudice to plaintiff

bringing such claims in the Eastern District.  In his Northern District complaint, plaintiff did not

include his claims concerning unsafe prison conditions based on the presence of arsenic in the

water.

Plaintiff may join multiple claims if they are all against a single defendant.  Fed. R. Civ.

P. 18(a).  Unrelated claims against different defendants must be pursued in multiple lawsuits.  See

George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007).  This rule is intended "not only to prevent

the sort of morass [a multiple claim, multiple defendant] suit produce[s], but also to ensure that

prisoners pay the required filing fees -- for the Prison Litigation Reform Act limits to 3 the

4

number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g)." <u>George</u>, 507 F.3d at 607; <u>see also</u> Fed. R. Civ. P. 20(a)(2) (joinder of defendants not permitted unless both commonality and same transaction requirements are satisfied).

Plaintiff's claims concerning the quality of the water do not arise from the same conduct, transaction, or occurrence as the medical treatment or failure to provide medical treatment for plaintiff's medical issues. Fed. R. Civ. P. 15(c). In addition, his claims are not against a single defendant. None of the defendants named in connection with plaintiff's medical care were responsible for providing water to the prisons.[4] Thus, plaintiff's claims based on an allegation that there were arsenic levels in the drinking water that exceeded EPA standards, or that the allegedly contaminated water caused plaintiff physical injuries, are not properly joined with plaintiff's Eighth Amendment claims concerning medical care. Therefore, such claims must be dismissed without prejudice to their renewal in a separate civil rights action or actions.

2. <u>Conditions of Confinement</u>

In addition, for the following reasons, plaintiff's claims concerning contaminated water should also be dismissed for failure to state a claim.

a. <u>Plaintiff's Allegations</u>

Plaintiff contends that the United States Environmental Protection Agency ("USEPA") defines arsenic as a mineral known to cause cancer in humans at high concentrations and is linked to other adverse health effects. He alleges that it is "known that some people who drink water containing arsenic in excess of the maximum contaminate level . . . over many years may experience skin damage . . . circulatory system problems, and may have an increased risk to getting cancer." (ECF No. 15 at 7.) Plaintiff claims that from 2000 through 2005, while at HDSP, he consumed drinking water with high levels of arsenic provided by defendants Secretary

---

[4] Plaintiff vaguely claims that defendants Runnels, Swarthout, and Price were "legally responsible" for plaintiff's medical treatment (ECF No. 15 at 3), but such allegations are solely based on their roles as wardens, without any factual connection or link to plaintiff's medical treatment. As plaintiff has been informed, defendants are not liable based on a theory of respondeat superior in federal civil rights actions.

Beard, Warden Runnels, and Stanley, who "knew of the water problems indirectly or directly" through the Consumer Confidence Report, and they allowed the consumption of such contaminated water to continue. (ECF No. 15 at 7-8, 20-21.) From July 2005 to December of 2012, plaintiff alleges he consumed drinking water with high levels of arsenic and nitrate provided by CSP-SOL, "which the defendants [Beard, Warden Swarthout, and nonparty Scott Alldridge, Chief Plant Operator ("CPO"),[5] were a part of running . . . in some capacity whether direct or indirect, and who knew of the water problems indirectly or directly" through the Consumer Confidence Report, and they allowed the consumption of such contaminated water to continue. (ECF No. 15 at 21.) Between 2012 and 2014, while housed at DVI, plaintiff consumed drinking water that had high levels of arsenic and nitrate provided by DVI, and was also exposed to asbestos. (ECF No. 15 at 18, 160.) Plaintiff alleges defendants Beard, Warden Price, and Correctional Plant Manager Millard allowed the consumption of such contaminated water to continue, and defendants were aware of "every test result" and received notice through the Consumer Confidence Report Certificate provided under CDCR policy. (ECF No. 15 at 21.)

As a result of the actions and inactions of defendants Beard, Runnels, Stanley, Swarthout, Price, and Millard, plaintiff alleges he unknowingly ingested such contaminated drinking water for many years at an excessive rate, and became progressively ill, starting with urination problems and pain in his penis in 2000, and culminating in a diagnosis of prostate cancer in 2013 (ECF No. 15 at 200).

### b. Legal Standards

The Eighth Amendment, which provides that "cruel and unusual punishment [shall not be] inflicted," protects prisoners from inhumane conditions of confinement. Farmer v. Brennan, 511 U.S. 825, 833 (1994). The Eighth Amendment is violated when prison officials act with deliberate indifference to an excessive risk of harm to an inmate's health or safety. See, e.g., Farmer, 511 U.S. at 828; Thomas v. Ponder, 611 F.3d 1144, 1151-52 (9th Cir. 2010).

////

---

[5] Plaintiff did not name Alldridge as a defendant, either in the case caption or in the list of defendants set forth in the text of his pleading. (ECF No. 15 at 1; 2-6.)

Two requirements must be met to show an Eighth Amendment violation.  <u>Farmer</u>, 511 U.S. at 834.  "First, the deprivation must be, objectively, sufficiently serious."  <u>Id.</u> (internal quotation marks and citation omitted).  Thus, a prisoner may state "a cause of action under the Eighth Amendment by alleging that [prison officials] have, with deliberate indifference, exposed him to [conditions] that pose an unreasonable risk of serious damage to his future health."  <u>Helling v. McKinney</u>, 509 U.S. 25, 35 (1993).  But in addition to the inquiry into the seriousness of the potential harm, the court must also

> assess whether society considers the risk . . . to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

<u>Id.</u> at 36.

Second, "prison officials must have a sufficiently culpable state of mind," which for conditions of confinement claims, "is one of deliberate indifference."  <u>Id.</u> (internal quotation marks and citation omitted).  To act with deliberate indifference, a prison official must both be aware of facts from which the inference could be drawn that an excessive risk of serious harm exists, and he must also draw the inference.  <u>Farmer,</u> 511 U.S. at 837.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  <u>Id.</u> at 847.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  <u>Id.</u> at 842.  However, "an official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot . . . be condemned as the infliction of punishment."  <u>Id.</u> at 838.  Therefore, the circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim.  <u>Johnson v. Lewis</u>, 217 F.3d 726, 731 (9th Cir. 2006).  The exposure to toxic substances can support a claim under section 1983.  <u>See</u> <u>Wallis v. Baldwin</u>, 70 F.3d 1074, 1076-77 (9th Cir. 1995) (exposure to asbestos); <u>see also</u> <u>Helling</u>, 509 U.S. at 35-37 (using "demonstrably unsafe drinking water" as a hypothetical example of a potential conditions of confinement claim).  Mere negligence on the part of a prison official is not sufficient to establish liability, but rather, the

1  official's conduct must have been wanton.  Farmer, 511 U.S. at 835; Frost v. Agnos, 152 F.3d

2  1124, 1128 (9th Cir. 1998).

3                          c. Discussion

4       Initially, the court notes that plaintiff's claims concern contaminated water at three

5  different prisons, HDSP, CSP-SOL, and DVI.  While plaintiff names defendant Beard in

6  connection with the incidents at each prison, none of the other named defendants were involved

7  with the other two prisons.  None of these prisons are geographically close to the other, and none

8  draw water from the same well.  In addition, plaintiff is now claiming that the water at CSP-SOL

9  and DVI also contained a high level of nitrate.  Thus, it does not appear that plaintiff's water

10 claims are properly joined in one action.  Rather, it appears that plaintiff should pursue such

11 claims in separate actions because they involve different defendants, and the water evidence,

12 water treatment, levels of alleged contamination, and the notices concerning any such

13 contamination will differ.

14      Second, such separation of claims also appears appropriate given the dates at issue.  It

15 appears from the face of his pleading that his HDSP claims are likely barred by the statute of

16 limitations.[6]  In order to avoid such bar, plaintiff must demonstrate that his HDSP water claims

17 relate back to the Eighth Amendment medical claims raised in the Northern District.  Fed. R. Civ.

18 P. 15(c).  Because plaintiff did not raise such contaminated water claims in the Northern District

19 complaint, it appears unlikely such claims would relate back.  But even assuming the water

20

21 [6]  California law determines the applicable statute of limitations in this § 1983 action.  Fink v.
   Shedler, 192 F.3d 911, 914 (9th Cir. 1999).  Effective January 1, 2003, the applicable California
22 statute of limitations was extended to two years.  See Jones v. Blanas, 393 F.3d 918, 927 (9th Cir.
   2004) (citing Cal. Civ. Proc. Code § 335.1).  California law also tolls for two years the limitations
23 period for inmates "imprisoned on a criminal charge, or in execution under the sentence of a
   criminal court for a term less than for life."  Cal. Civ. Proc. Code § 352.1.  The Ninth Circuit has
24 held that a limitations period may be tolled while a claimant pursues an administrative remedy.
   Daviton v. Columbia/HCA Healthcare Corp., 241 F.3d 1131 (9th Cir. 2001.)

25

26 Federal law governs when plaintiff's § 1983 claims accrued and when the limitations period
   begins to run.  Cabrera v. City of Huntington Park, 159 F.3d 374, 379 (9th Cir. 1998).  A claim
27 under 42 U.S.C. § 1983 accrues when the "wrongful act or omission results in damages."
   Wallace v. Kato, 549 U.S. 384, 388, 391 (2007).  In other words, a claim accrues "when the
28 plaintiff knows or has reason to know of the injury which is the basis of the action."  Maldonado
   v. Harris, 370 F.3d 945, 954-55 (9th Cir. 2004).

8

claims relate back, plaintiff would then be required to demonstrate that the accrual date for such

water claims fell within the four year period prior to the filing of his complaint in the Northern

District in December of 2014, or that he was entitled to equitable tolling of the limitations period.

If the water claims do not relate back to plaintiff's medical claims raised in the Northern

District, plaintiff must demonstrate that the accrual date for his HDSP water claims fell within

four years immediately preceding the June 16, 2015 filing of the instant complaint, or that he was

entitled to equitable tolling.

Third, plaintiff again fails to state cognizable claims concerning the water at HDSP, CSP-

SOL, and DVI.

HDSP:  2000-2005.[7]  The notice provided by HDSP states that the USEPA standard was

enacted in January of 2006, and "lowered the maximum contaminant level (MCL) of arsenic from

0.050 milligrams per liter (mg/l) to 0.010 mg/l."  (ECF No. 15 at 37.)  However, the notice also

states that the contamination is not an "emergency," and persons at HDSP "do not need to use an

alternative water supply (e.g., bottled water).  The notice warns that "some people who drink

water containing arsenic in excess of the MCL over many years may experience skin damage or

circulatory system problems, and may have an increased risk to getting cancer."  (Id.)

Plaintiff claims that from 2000 to 2008, the level of arsenic in the water at HDSP was high

and exceeded the standard set by the USEPA, citing the HDSP notice.  (ECF No. 15 at 7, 37.)

But the notice does not indicate the date the notice was posted or issued, and does not provide test

results for 2000 to 2005.  (ECF No. 15 at 37, 39, 152.)  Rather, the notice states that "the annual

averages for their three wells was 0.011 mg/l, 0.018 mg/l, and 0.034 mg/l."  (ECF No. 15 at 37.)

The notice does not indicate over what period of time the averages were calculated.  Moreover,

the lower EPA standard was not enacted until after plaintiff left HDSP.  Plaintiff alleges no facts

demonstrating how defendants could plausibly be deliberately indifferent from 2000 to 2005,

where the standard for arsenic levels was not reduced until January of 2006.  In addition, the

notice states that "some people" who drink the water "over many years" "may" experience health

---

[7]  Plaintiff was housed at HDSP from 2000 to 2005, and for a 32-day period in 2014.

issues.  Such potential health risks is insufficient to demonstrate an excessive risk to the inmate population.  Also, the notice states that the prison was installing an arsenic treatment plant to comply with the new standard, and completion was expected between January and June of 2008.  (ECF No. 15 at 37.)  This suggests defendants were attempting to bring the water supply into compliance with the new EPA standard.  For all of these reasons, plaintiff's allegations, without more, do not demonstrate defendants' deliberate indifference to plaintiff's conditions of confinement.  Given that the lower arsenic levels were not enacted until 2006, it is unclear whether plaintiff can allege facts demonstrating deliberate indifference on the part of prison officials at HDSP from 2000 to 2005, the period in which plaintiff was housed at HDSP.

CSP-SOL:  2005-2012.  Plaintiff did not provide a CSP-SOL notice similar to the HDSP notice, or demonstrate that defendants at CSP-SOL were aware of the HDSP notice.  Rather, he provided a report which states that "during 2012 the California State Prison-Solano Water Treatment Plant provided CSP-S[OL] and CMF customers with drinking water that is safe, clean and meets all Federal and State requirements."  (ECF No. 15 at 83.)  Arsenic was not separately listed in the 2012 Consumer Confident Report for CSP-SOL (June 7, 2013), and the report does not state that the water at CSP-SOL contained high levels of arsenic.  (ECF No. 15 at 79-83.)  Plaintiff claims that there were high levels of arsenic and nitrate in the water at CSP-SOL from 2005 through 2012, but provides no notice or other document to suggest his claim is plausible.[8]  In light of the 2012 report provided, plaintiff fails to state a cognizable claim concerning the water at CSP-SOL.

DVI:  2012-2014.  Similarly, plaintiff did not provide a notice similar to the HDSP notice, or demonstrate that defendants at DVI were aware of the HDSP notice.  Plaintiff provided a 2010 DVI Water Quality Report which states that "last year DVI met all EPA and state primary drinking water health standards."  (ECF No. 15 at 141.)  The report noted arsenic at 10 MCL, with an asterisk:

---

[8]  Plaintiff refers to an exhibit SS-1, but no such exhibit was provided.  Plaintiff provides exhibits A-Z, and AA-KK, but his exhibits then jump from KK to OOO to WW-1.  (ECF No. 15 at 167, 169, 171.)  In other words, although plaintiff refers to exhibits LL through VV, such exhibits were not provided.

*Arsenic above 5 ppb, but below or equal to 10 ppb:

> While your drinking water meets the federal and state standard for arsenic, *it does contain low levels of arsenic*. The arsenic standard balances the current understanding of arsenic's possible health effects against the costs of removing arsenic from drinking water. The U.S. Environmental Protection Agency continues to research the health effects of low levels of arsenic, which is a mineral known to cause cancer in humans at high concentrations and is linked to other health effects such as skin damage and circulatory problems.

(ECF No. 15 at 144 (emphasis added).) DVI was awaiting the repair and restart of the new Reverse Osmosis plant to treat ground water. The Reverse Osmosis plant started water production in June of 2009 and ceased production in April of 2010. (ECF No. 15 at 141.) While such plant was nonoperational, DVI drew on a combination of original wells which supplied treated drinking water that met "all primary drinking water standards." (Id.)

Plaintiff provided a similar 2012 DVI Water Quality Report which states that "last year DVI met all EPA and state primary drinking water health standards." (ECF No. 15 at 162.) The report noted arsenic at 10 MCL, with an asterisk:

Arsenic above 5 ppb, but below or equal to 10 ppb:

> While your drinking water meets the federal and state standard for arsenic, *it does contain low levels of arsenic*. The arsenic standard balances the current understanding of arsenic's possible health effects against the costs of removing arsenic from drinking water. The U.S. Environmental Protection Agency continues to research the health effects of low levels of arsenic, which is a mineral known to cause cancer in humans at high concentrations and is linked to other health effects such as skin damage and circulatory problems.

(ECF No. 15 at 148 (emphasis added).) DVI's Ground Water Treatment Facility ("GWTF") re-started in January of 2012, and completed a ninety day test run in April. (ECF No. 15 at 147.) The GWTF was taken off line for cleaning, inspection and repairs, but restarted in July and ran through late November, when it was taken offline for semi-annual cleaning. The GWTF restarted the first week of December and operated for the remainder of the year. (Id.) When the GWTF is off-line, a combination of the original wells is blended and supplies DVI with "well water that meets primary standards for USEPA and California DHS drinking water." (ECF No. 15 at 147.)

Plaintiff's allegation that the water at DVI contained high levels of arsenic is belied by the DVI water quality report that confirms the arsenic levels were low in 2010 and 2012. Plaintiff identifies no facts suggesting that arsenic levels escalated in 2013 and 2014, or demonstrating that DVI's water contained high levels of arsenic in 2013 and 2014. In addition, the water quality report confirms that USEPA continues to research the health effects of low levels of arsenic. This suggests that it remained unknown what health effects result from exposure to low levels of arsenic. Defendants cannot be deliberately indifferent to facts that are unknown to them. In addition, the report's claim that the EPA standard was calculated by balancing the current understanding of arsenic's possible health effects against the costs of removing arsenic from drinking water, suggests that low levels of arsenic in the population's water supply may be tolerated by society. In any event, defendants are not deliberately indifferent where plaintiff fails to demonstrate that defendants were aware of an excessive risk to plaintiff's health and safety. Plaintiff fails to allege facts demonstrating such awareness.

For all of the above reasons, plaintiff's allegations that defendants Beard, Runnels, Stanley, Swarthout, Price and Millard were deliberately indifferent to plaintiff's conditions of confinement must be dismissed, but with leave to amend in separate civil rights actions.

Fourth, as noted above, plaintiff provided a 2017 lab report reflecting the arsenic level of plaintiff's blood was 4 micrograms per liter. However, the lab report also states that a whole blood arsenic level of more than 100 micrograms per liter "is indicative of acute/chronic exposure." (ECF No. 17 at 2.) In addition, the lab report states that urine is usually the best specimen for arsenic analysis because "[b]lood levels tend to be low even when urine concentrations are high." (Id.)

The interpretation of medical test results and the evaluation of such results in the context of exposure to unreasonably high arsenic levels require medical and/or toxicological expertise. Fed. R. Evid. 701, 702. The issue is not whether there is arsenic in drinking water, but at what contaminant level the water becomes unsafe to drink, whether a named defendant was aware of a substantial risk to inmate health due to the contaminant level, and whether the prisoner's medical issues were caused by arsenic exposure. See Nguyen v. Biter, 2015 WL 5232163 (E.D. Cal. Sept.

12

8, 2015) (in prisoner civil rights action alleging Kern Valley State Prison ("KVSP") drinking water contained arsenic, defendants granted summary judgment on objective prong of Eighth Amendment claim because, although there was arsenic in the local drinking water, prisoner provided no scientific evidence that the arsenic was present in sufficient amounts to cause the skin and other conditions he complained of, and there was no medical evidence that his conditions were specific to arsenic exposure), adopted by district court, September 30, 2015. In order to survive a motion for summary judgment, plaintiff will be required to show that his medical conditions were caused by arsenic exposure.[9]

Here, plaintiff's lab result may tend to show he was exposed to arsenic. But he also provided medical records that suggest he has a family history of cancer. In a 2012 telemedicine consult, plaintiff reported no prostate cancer in the family, but two sisters had breast cancer. (ECF No. 15 at 182.) In a 2014 radiation oncology consult, plaintiff reported history of colon cancer in paternal grandmother, possible prostate cancer in maternal grandfather, breast cancer in

_____

[9] For example, in Nguyen, the district court found the following facts to be undisputed:

> Arsenic is the twentieth most abundant element on earth, and it is impossible to find drinking water in the environment that is free of arsenic; all public drinking water in the United States contains arsenic at some concentration. Arsenic is not necessarily poisonous. The difference between a medicine and a poison is the dose, and arsenic trioxide, for example, is a Food and Drug Administration-approved intravenous pharmaceutical. Long-term consumption of very large amounts of arsenic in drinking water can cause disease, but these diseases are limited to very specific skin lesions; cancers of the skin, bladder and lung; cardiovascular and cerebrovascular diseases; and diabetes mellitus. These diseases also typically require both exposure periods of twenty years or more and exposure to drinking water with arsenic concentrations of generally more than 200 micrograms per liter ("mcg/L") or 200 parts per billion ("ppb"). There is no scientific evidence that predicts illness from ingestion of drinking water at 26 ppb (0.026 mg/L), such as KVSP's water; and no epidemic of skin changes, internal organ cancers, or neurological and cardiac damage resulting from drinking water at or below an arsenic MCL of 50 mcg/L was ever identified in the United States.

Nguyen, 2015 WL 5232163, at **4-5. Moreover, in Williams v. Biter, 2017 WL 431353 (E.D. Cal. Jan. 31, 2017), before recommending that the defendants' motion to dismiss be granted, the judge surveyed decisions of other courts with regard to complaints concerning arsenic in the water at KVSP, noting that some judges were dismissing such claims at screening, or on motion to dismiss, while other judges allowed the cases to proceed to summary judgment. Id. at *7-10.

a sister, and cervical cancer in another sister.  (ECF No. 15 at 196.)  In addition, plaintiff arrived at HDSP on August 24, 2000 (ECF No. 15 at 7), and in September 2000, began having urination problems, pain in his penis, raw area on his penis, penile non-bleeding ulcer on penis shaft, and a penile skin ulcer.  (ECF No. 15 at 8.)  Such early symptoms suggest plaintiff began suffering these medical issues even before his alleged long-term exposure to arsenic.

Finally, plaintiff included, for the first time, a passing reference to an exposure to asbestos at DVI.  (ECF No. 15 at 18.)  Plaintiff states that he was not informed of such asbestos exposure, but staff was so notified.  (Id., citing Ex. JJ 1-12.)  Exhibit JJ-1 is an "Employee Asbestos Notification" form notifying employees working at DVI that buildings constructed prior to 1979 are known to have "asbestos-containing materials ("ACM"), as required by state law.[10]  (ECF No. 15 at 160.)  The notice generally advises employees concerning how to follow safe work practices to "minimize the potential for disturbing ACM."  (Id.)  The notice appears to be informational, and does not indicate that asbestos had been disturbed at DVI.  (Id.)  Such notice, standing alone, is insufficient to demonstrate a violation of plaintiff's constitutional rights.  Aside from this notice, plaintiff does not identify a specific circumstance of asbestos exposure.  Plaintiff is advised that his vague and conclusory allegation is insufficient to state a cognizable claim of asbestos exposure.

For all of the above reasons, plaintiff's claims against defendants Beard, Runnels, Stanley, Swarthout, Price and Millard are dismissed without prejudice for improper joinder.[11]  As discussed above, it is unclear whether plaintiff can amend to state cognizable claims against these defendants, but if plaintiff chooses to amend to pursue his claims concerning arsenic contamination of the water at HDSP, CSP-SOL, or DVI, he must do so in separate civil rights actions.  In addition, it is unclear whether plaintiff's claims concerning water at HDSP were timely-filed.  In an abundance of caution, however, such claims are dismissed without prejudice

---

[10]  The pages following exhibit JJ-1 pertain to water reports from DVI, and the next exhibit is KK-1, a lab report from 2012.

[11]  Plaintiff may ask the court to file the case as of June 16, 2015, *nunc pro tunc*., and that the case be assigned to the undersigned magistrate judge.

should plaintiff be able to demonstrate a later date of accrual hinging on when he received notice of the elevated arsenic levels in the water at HDSP.

   D. Deliberate Indifference to Medical Care

      1. Eighth Amendment Standards

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). This requires plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." Id. (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citation and internal quotations marks omitted), overruled on other grounds WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

Deliberate indifference is established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (emphasis added) (citation and internal quotation marks omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citation omitted).

A difference of opinion between an inmate and prison medical personnel -- or between medical professionals -- regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Toguchi, 391 F.3d at 1058. To establish that a difference of opinion rises to the level of deliberate indifference, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (citation omitted). Additionally, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment

////

under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle, 429 U.S. at 106.

### 2. Statute of Limitations

The Civil Rights Act, 42 U.S.C. § 1983, contains no statute of limitations.  In federal court, federal law determines when a claim accrues, and "under federal law, a claim accrues 'when the plaintiff knows or has reason to know of the injury which is the basis of the action.'" Lukovsky v. City and County of San Francisco, 535 F.3d 1044, 1048 (9th Cir. 2008) (quoting Two Rivers v. Lewis, 174 F.3d 987, 991 (9th Cir. 1999); Fink v. Shedler, 192 F.3d 911, 914 (9th Cir. 1999)).  In the absence of a specific statute of limitations, federal courts should apply the forum state's statute of limitations for personal injury actions.  Lukovsky, 535 F.3d at 1048; Jones v. Blanas, 393 F.3d 918, 927 (2004); Fink, 192 F.3d at 914.  California's two-year statute of limitations for personal injury actions applies to 42 U.S.C. § 1983 claims.  See Jones, 393 F.3d at 927.  California's statute of limitations for personal injury actions requires that the claim be filed within two years.  Cal. Code Civ. Proc. § 335.1.

In actions where the federal court borrows the state statute of limitations, the court should also borrow all applicable provisions for tolling the limitations period found in state law.  See Hardin v. Straub, 490 U.S. 536, 539 (1989).  Under California's Code of Civil Procedure, § 352.1(a), if a prisoner is not serving a life term, he is subject to a two-year tolling of the statute of limitations, resulting in a four-year statute of limitations.  However, if a prisoner is serving a life term, he is not eligible for tolling as a prisoner, and the statute of limitations is only two years.

Although the statute of limitations is an affirmative defense that normally may not be raised by the court *sua sponte*, it may be grounds for *sua sponte* dismissal of an in forma pauperis complaint where the defense is complete and obvious from the face of the pleadings or the court's own records.  See Franklin v. Murphy, 745 F.2d 1221, 1228-30 (9th Cir. 1984).  See Levald, Inc. v. City of Palm Desert, 988 F.2d 680, 686-87 (9th Cir. 1993).

////

////

16

3. HDSP

2    Plaintiff was housed at HDSP from 2000 to 2005.  (ECF No. 15 at 7.)  Plaintiff named

3    defendants Dr. Rohlfing, Dr. Kreitler, Dr. Filice, and Dr. Acquva in the original complaint filed in

4    the Northern District.

5    a. Defendant Dr. Brown

6    Plaintiff alleges that on September 19, 2000, Dr. Brown documented plaintiff's symptoms

7    as a raw area on his penis, penile non-bleeding ulcer on shaft, and a penile skin ulcer, and Dr.

8    Brown prescribed triple antibiotics.  (ECF No. 15 at 8, 41 (Ex. B).)  Dr. Brown also ordered and

9    reviewed lab work.  (ECF No. 15 at 43-45.)  One lab report is marked "WNL" [within normal

10   limits] and signed and dated by Dr. Brown in his own handwriting.  (ECF No. 15 at 44.)  Plaintiff

11   then alleges that from September 19, 2000, to December 14, 2001, Dr. Brown "failed to

12   medically treat the plaintiff" despite such documented symptoms.  (ECF No. 15 at 8.)  Later,

13   plaintiff claims that Dr. Brown failed to "adequately medically treat plaintiff even after the test

14   results knowing that plaintiff had high priority and emergency medical needs due to the

15   continuing penis pain and rawness around the penis head, the continuing bleeding ulcer as well as

16   the continuing urination problems, that Dr. Brown did not assess the problem, and through his

17   neglect the plaintiff's problem worsen[ed] throughout" for the duration of plaintiff's housing at

18   HDSP.  (ECF No. 15 at 10.)  Plaintiff cites to Exhibit I 1-5, none of which list Dr. Brown as the

19   attending physician.  (ECF No. 15 at 58-62.)  Plaintiff reiterated Dr. Brown's alleged failure to

20   treat plaintiff, citing his Exhibit M 1-4.  (ECF No. 15 at 11.)  (ECF No. 15 at 70-72 (Ex. M).)

21   None of the records in Exhibit M bear Dr. Brown's name.  At the conclusion of plaintiff's factual

22   allegations, he also alleges that defendant Brown failed to treat plaintiff's stomach pain, and that

23   Dr. Brown's failure to treat all of plaintiff's medical issues caused plaintiff to contract prostate

24   cancer.  (ECF No. 15 at 22, citing Ex. UU-1, not appended.)

25   First, plaintiff did not name Dr. Brown in the complaint filed in the Northern District, and

26   it is clear from the face of the amended pleading that plaintiff's claims that Dr. Brown was

27   deliberately indifferent to plaintiff's problems with his penis in 2000 are barred by the statute of

28   limitations.  Plaintiff did not file the instant action until June 16, 2015, long after the four year

statute of limitations expired. Indeed, the Northern District court found that plaintiff's Eighth Amendment medical claims against defendant Chudy at CTF, which accrued no later than September 3, 2009, were barred by the statute of limitations. Johnson v. Thuddy, No. 3:14-cv-04958-JST (N.D. Cal. June 28, 2017).

Second, plaintiff's claim that Dr. Brown failed to treat plaintiff are contradicted by Dr. Brown's medical records that reflect he prescribed antibiotics and ordered lab work for plaintiff. Plaintiff's disagreement with such treatment does not demonstrate deliberate indifference on the part of Dr. Brown. Moreover, because Dr. Brown noted that the lab tests were within normal limits, Dr. Brown's failure to take further action in response to plaintiff's symptoms on September 19, 2000, cannot be viewed as deliberate indifference, absent facts not alleged here. Plaintiff's allegation that Dr. Brown "did not assess the problem," is merely a difference of opinion as to Dr. Brown's diagnosis. Plaintiff's claim that Dr. Brown "neglected" plaintiff fails to rise to the level of deliberate indifference. In addition, the medical records provided by plaintiff demonstrate that other medical doctors responded to plaintiff's medical issues at HDSP.[12] Plaintiff alleges no facts demonstrating Dr. Brown was even aware of plaintiff's bleeding ulcer or problems with urination. Thus, absent allegations that at some point after September 19, 2000, plaintiff presented to Dr. Brown with worsening symptoms, or that Dr. Brown became aware of plaintiff's alleged worsening symptoms by some other means, plaintiff fails to state a cognizable deliberate indifference claim as to Dr. Brown.

Third, plaintiff alleges that in October of 2001, he continued to have urination problems, and he put in a sick call slip to see the physician, but the appointment was cancelled on October 9, 2001. (ECF No. 15 at 9.) Plaintiff provided a physician's progress note that states that plaintiff would be re-ducated for the doctor's line -- "inmate at law library." (ECF No. 15 at 52.) Plaintiff

---

[12] Indeed, plaintiff reiterates his claim that Dr. Brown failed to treat plaintiff for his penis pain, bleeding ulcers and continuing urination problems, citing Exhibit M 1-4, but such exhibits do not reference Dr. Brown as the treating doctor. (ECF No. 15 at 11, Ex. M (ECF No. 15 at 71-72.) Plaintiff alleges his symptoms warranted "more sufficient care" and the "lack of professionalism" worsened his penile and urination problems. Such allegations demonstrate, at most, mere negligence, not deliberate indifference, as the record reflects that plaintiff did receive medical treatment on numerous occasions.

alleges that he was re-ducated for an appointment on November 29, 2001, but was not escorted to see the physician. The progress note reflects "not seen," with no explanation. (ECF No. 15 at 52.) However, plaintiff does not connect these allegations to Dr. Brown or any other doctor. Thus, it is unclear whether Dr. Brown or any other defendant was aware of such appointments. In any event, to the extent plaintiff claims that a doctor was deliberately indifferent for failing to see plaintiff in October or November of 2001 are now barred by the statute of limitations.

For all of the above reasons, the undersigned recommends that plaintiff's claims against Dr. Brown be dismissed as barred by the statute of limitations.

b. Dr. Rohlfing

Plaintiff alleges that he was seen on December 14, 2001, by Dr. Rohlfing. Plaintiff claims that Dr. Rohlfing checked plaintiff's penis and his prostate through the anus, yet failed to document such examination, leaving plaintiff in discomfort and which led to the "prostate being enlarged and unattended to." (ECF No. 15 at 9.) Plaintiff cites his Exhibit G, which is Dr. Rohlfing's progress note from the December 14, 2001 examination. (ECF No. 15 at 54.) The progress note does not reflect such examinations, but does record Dr. Rohlfing's assessment that plaintiff suffered from chronic nasal congestion, chronic indigestion, and possible hemorrhoids, and prescribed plaintiff various medications, and stated he would order a complete blood count and complete metabolic panel to check the status of plaintiff's liver, also noting that plaintiff was present during Dr. Rohlfing's dictation of the progress note. (ECF No. 15 at 54.) Plaintiff provided the results of the lab tests ordered by Dr. Rohlfing. (ECF No. 15 at 56, 58, 59.)

Plaintiff alleges that from December 21, 2001, to October 21, 2002, Dr. Rohlfing failed to "adequately medically treat plaintiff" for the continuing pain in his penis, the bleeding ulcers, and continuing urination problems. (ECF No. 15 at 9, citing Ex. I 1-5.) Two of the exhibits are test results from Dr. Rohlfing dated December 21, 2002, and both bear his initials, reflecting his review. (ECF No. 15 at 58, 59.) The remaining exhibits note Dr. Kreitler as the ordering physician, not Dr. Rohlfing. (ECF No. 15 at 60-62.)

Plaintiff alleges that Dr. Rohlfing failed to treat plaintiff for his continuing pain in his penis, bleeding ulcers, and continuing urination problems, which Dr. Rohlfing knew about from

19

the "many test results" and failed to acknowledge plaintiff's symptoms and let him suffer. (ECF No. 15 at 11.) Plaintiff alleges Dr. Rohlfing "neglect[ed]" the seriousness of plaintiff's "high priority and emergency medical needs" which allowed plaintiff's prostate to enlarge, leading to increased urination problems, with sleepless nights. (ECF No. 15 at 12.) At the conclusion of plaintiff's factual allegations, he also alleges that defendant Rohlfing failed to treat plaintiff's stomach pain, and that Dr. Rohlfing's failure to treat all of plaintiff's medical issues caused plaintiff to contract prostate cancer. (ECF No. 15 at 22.)

Although plaintiff included his deliberate indifference claims against Dr. Rohlfing in the complaint filed in the Northern District, it appears from the face of plaintiff's pleading that such claims are barred by the statute of limitations. Plaintiff alleges that Dr. Rohlfing failed to treat plaintiff from December 21, 2001, to October 21, 2002. Plaintiff filed the Northern District complaint on December 13, 2014, almost 13 years after Dr. Rohlfing first examined plaintiff. Therefore, plaintiff's claims against Dr. Rohlfing should be dismissed as barred by the statute of limitations.

c. Dr. Filice

Plaintiff identifies Dr. Filice as a medical doctor and Chief Medical Officer at HDSP, and claims Dr. Filice is responsible for the supervision of Dr. Brown, Dr. Rohlfing, Dr. Kreitler, and Dr. Kraft, and legally responsible for the medical treatment of all inmates at HDSP. (ECF No. 15 at 4.) Plaintiff alleges that Dr. Filice failed to medically treat plaintiff for the raw area of his penis, non-bleeding ulcer, and penile skin ulcer, and neglected to medically treat plaintiff when he knew of plaintiff's "high priority and emergency medical needs" due to the raw area on his penis, non-bleeding ulcer, and penile skin ulcer, and did nothing to relieve plaintiff's pain. (ECF No. 15 at 8-9, citing Ex. E 1-6.) Later in the pleading, plaintiff alleges that Dr. Filice failed to adequately treat plaintiff even though Dr. Filice knew plaintiff had raw penis pain, a bleeding ulcer, and continuing urination problem which kept plaintiff in "great agonizing pain and countless sleepless nights [due] to the enlarged prostate and frequent trips to the restroom." (ECF No. 15 at 10.) Plaintiff alleges that Dr. Filice did nothing to address plaintiff's pain. (ECF No. 15 at 10, citing Ex. I 1-5.) Plaintiff alleges that Dr. Filice failed to medically treat plaintiff for the

20

continuing pain in his penis, bleeding ulcers, and continuing urination problem, by not attending to plaintiff after reviewing medical reports and blood test results. (ECF No. 15 at 11.) Plaintiff alleges that Dr. Filice's "lack of professional care" caused plaintiff's prostate to become enlarged, which made plaintiff's urination problems worse, and his bleeding ulcers to "erupt," keeping plaintiff in constant pain, leading to the deterioration of plaintiff's prostate, and failed to diagnosis the symptoms which led to cancer. (ECF No. 15 at 13, citing Ex. O).) At the conclusion of plaintiff's factual allegations, he also alleges that defendant Filice failed to treat plaintiff's stomach pain, and that Dr. Filice's failure to treat all of plaintiff's medical issues caused plaintiff to contract prostate cancer. (ECF No. 15 at 22.)

Review of the exhibits provided by plaintiff reflect the following:

Dr. Filice was the Director, or Lab Director, not the ordering or treating physician, as identified on lab tests performed in 2000 to 2002 at HDSP. (ECF No. 15 at 43-45 ("Director"), 47-48 ("Director"), 60 (Ex. I) ("Lab Director").) Exhibits I 1-5 are test results from Dr. Rohlfing dated December 21, 2002, which bear his initials, reflecting his review. (ECF No. 15 at 58, 59.) The remaining exhibits note Dr. Kreitler as the ordering physician, not Dr. Filice, and the results are initialed by Dr. Kreitler, reflecting his review of the results. (ECF No. 15 at 60-62 (Ex. I).) Exhibit O is a November 3, 2004 lab result identifying the treating doctor as Dr. Kraft, who reviewed the record on November 22, 2004. (ECF No. 15 at 76 (Ex. O).) This 2004 lab result does not reflect Dr. Filice's name, and does not state that plaintiff suffered from cancer. (Id.) Indeed, the records provided by plaintiff confirm that he was diagnosed with adenocarcinoma of the prostate in 2013, long after his transfer away from HDSP. (ECF No. 15 at 197.)

First, although plaintiff included his deliberate indifference claims against Dr. Filice in the complaint filed in the Northern District, it appears from the face of plaintiff's pleading that such claims are barred by the statute of limitations. Even assuming Dr. Filice remained CMO in 2005, plaintiff filed the Northern District complaint on December 13, 2014, over 9 years after plaintiff was transferred away from HDSP. Accordingly, plaintiff's claims against Dr. Filice should be dismissed as barred by the statute of limitations.

////

Second, plaintiff's allegations against Dr. Filice are based on a theory of respondeat superior. Plaintiff does not identify Dr. Filice as plaintiff's treating physician; rather, he identifies Dr. Filice as the CMO, claims Dr. Filice supervised the other defendant doctors, and alleges Dr. Filice failed to treat plaintiff by not attending to plaintiff after reviewing medical reports and blood test results. The records provided by plaintiff confirm that plaintiff was treated by other doctors, and that Dr. Filice was identified as the "Director." Supervisory government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. Iqbal, 556 U.S. at 676. Thus, plaintiff's claims against Dr. Filice, even if timely-raised, fail in any event.

### d. Dr. Kreitler

Plaintiff alleges that Dr. Kreitler failed to medically treat plaintiff for the rawness in his penis area, the non-bleeding ulcer, and penile skin ulcer, and failed to prescribe any relief, leaving plaintiff to suffer until his next appointment which was months away. (ECF No. 15 at 8.) Plaintiff alleges that Dr. Kreitler also failed to "adequately medically treat" plaintiff's continuing pain in his penis, the bleeding ulcers, and continuing urination problems. (ECF No. 15 at 9, citing Ex. I 1-5.)

On October 21, 2002, plaintiff alleges Dr. Kreitler finally saw plaintiff for his bleeding ulcers, painful penis, and urination problems, and requested a blood test and a prostate specific antigen test ("PSA") to check plaintiff's prostate, which were given on October 24, 2002. (ECF No. 15 at 10, citing Ex. J & K.) Plaintiff was seen by Dr. Kreitler on November 26, 2002, but plaintiff claims the doctor "failed to diagnose plaintiff's symptoms of penile pain and suffering, bleeding ulcers, and the urination problem, which resulted in plaintiff's prostate to become enlarged and his urination problem to worsen "by the neglect defendant Kreitler inflicted on plaintiff." (ECF No. 15 at 10, citing Ex. L.) Plaintiff claims that from November 26, 2002, to November 3, 2004, Dr. Kreitler failed to treat plaintiff for his continuing pain in his penis, bleeding ulcers, and continuing urination problem, by "not attending to plaintiff's serious medical needs," resulting in plaintiff's illness getting worse, the pain growing more intense, the bleeding ulcers growing very irritable, and the urination problems never stopping due to Dr. Kreitler's

"lack of responsibility." (ECF No. 15 at 11.)  Plaintiff alleges that due to Dr. Kreitler's "inadequate medical care," plaintiff suffered great bodily harm that caused his prostate to grow and his urination problem to worsen, and the bleeding ulcers to continue on and off because of the lack of medical attention.  (ECF No. 15 at 12.)  At the conclusion of plaintiff's factual allegations, he also alleges that defendant Kreitler failed to treat plaintiff's stomach pain, and that Dr. Kreitler's failure to treat all of plaintiff's medical issues caused plaintiff to contract prostate cancer.  (ECF No. 15 at 22.)

The first two exhibits plaintiff cites are test results from Dr. Rohlfing dated December 21, 2002, which bear his initials, reflecting Dr. Rohlfing's review.  (ECF No. 15 at 58, 59.)  On October 21, 2002, Dr. Kreitler saw plaintiff, who stated plaintiff has bleeding ulcers and fainting spells.  (ECF No. 15 at 64 (Ex. J).)  Dr. Kreitler examined plaintiff and noted visible hemorrhoids.  (ECF No. 15 at 64, 68 (Ex. L).)  A CBC, H. Pylori titer, and PSA were ordered, the latter at plaintiff's request.  (ECF No. 15 at 64, 68.)  On October 24, 2002, the H. Pylori test ordered by Dr. Kreitler was noted as positive.  (ECF No. 15 at 60.)  Dr. Kreitler reviewed plaintiff's test results on October 25, 2002.  (ECF No. 15 at 61, 62, 66 (Ex. K), 70 (Ex. M).)  Plaintiff's PSA was 1.67.  (ECF No. 15 at 62.)  On October 26, 2002, Dr. Kreitler saw plaintiff for follow-up for his peptic ulcer disease; plaintiff was started on the H. pylori protocol #1 for 14 days.  (ECF No. 15 at 64, 68 (Ex. L).)

First, although plaintiff included his deliberate indifference claims against Dr. Kreitler in the complaint filed in the Northern District, it appears from the face of plaintiff's pleading that such claims are barred by the statute of limitations.  Plaintiff alleges that Dr. Kreitler failed to treat plaintiff from November 26, 2002, to November 3, 2004.  Plaintiff filed the Northern District complaint on December 13, 2014, over 12 years after plaintiff was initially seen by Dr. Kreitler, and over 10 years after November 3, 2004.  Therefore, plaintiff's claims against Dr. Filice should be dismissed as barred by the statute of limitations.

Second, to the extent plaintiff claims Dr. Kreitler failed to diagnose particular medical ailments, such failure fails to rise to the level of deliberate indifference.  As set forth above, medical malpractice and negligence claims are insufficient to demonstrate deliberate indifference.

23

e. <u>Dr. Kraft</u>

Plaintiff alleges that from November 3, 2004, to June 11, 2005, Dr. Kraft failed to treat plaintiff for his penis pain, bleeding ulcers, and continuing urination problems, even though the plaintiff submitted a medical request for treatment for his ongoing prostate, penile and urinary problems, which caused plaintiff's health to deteriorate, including more agonizing pain, and also led to an enlarged prostate, continued urination problems, and continuing bleeding ulcers.  (ECF No. 15 at 12.)  Plaintiff alleges that on November 3, 2004, Dr. Kraft ordered a platelet count, TSH, and RPR/TPPA blood test.  (ECF No. 15 at 11-12, citing Ex. N.)  Labs were drawn on November 3, 2004.  (ECF No. 15 at 72 (Ex. M).)  At the conclusion of plaintiff's factual allegations, he also alleges that defendant Kraft failed to treat plaintiff's stomach pain, and that Dr. Kraft's failure to treat all of plaintiff's medical issues caused plaintiff to contract prostate cancer.  (ECF No. 15 at 22.)

On November 22, 2004, Dr. Kraft reviewed plaintiff's lab results.  (ECF No. 15 at 71 (Ex. M), 74 (Ex. N), 76 (Ex. O).)  On April 8, 2005, plaintiff was seen by telepsychiatry, and scheduled for follow-up with Dr. Kraft.  (ECF No. 15 at 72 (Ex. M).)  On May 11, 2005, plaintiff submitted a health care services request form asking for an eye check, as well as check for prostate cancer.  (ECF No. 15 at 77.)

Plaintiff did not name Dr. Kraft in the complaint filed in the Northern District, and it is clear from the face of the amended pleading that plaintiff's claims that Dr. Kraft was deliberately indifferent to plaintiff's medical problems in 2004 to 2005 are barred by the statute of limitations. Plaintiff did not file the instant action until June 16, 2015, long after the four year statute of limitations expired.  Accordingly, plaintiff's claims against Dr. Kraft should be dismissed without leave to amend.

f. <u>Dr. Acquva</u>

Plaintiff identifies defendant Dr. Acquva as a medical doctor and Chief Medical Officer at HDSP.  (ECF No. 15 at 4.)  However, he included no factual allegations as to defendant Dr. Acquva.  (ECF No. 15 at 1-21.)  Rather, at the conclusion of his factual allegations, he alleges that

> defendants Brown, Rohlfing, Filice, Kreitler, Kraft, and Acquva all
> failed to medically treat plaintiff's immediate medical emergency
> needs of his penile pain, stomach pain, and bleeding ulcers, his
> urination problems which eventually caused the plaintiff to contract
> prostate cancer from the inadequate professional health care, and
> the neglect of plaintiff's suffering due to the lack of medical care ...
> between the years 2000 thru 2005.

(ECF No. 15 at 22.) Plaintiff does not allege that Dr. Acquva was his treating physician, and fails to include charging allegations setting forth a link or connection between Dr. Acquva and plaintiff's medical care. Therefore, Dr. Acquva should also be dismissed without leave to amend.

### g. Conclusion: HDSP

The undersigned recommends that plaintiff's claims concerning medical care at HDSP against defendants Brown, Rohlfing, Filice, Kreitler, Kraft, and Acquva, from 2000 to 2005, be dismissed as barred by the statute of limitations. The statute of limitations defense appears complete and obvious from the face of the amended complaint because the instant action was filed more than four years after the alleged events and omissions occurred, and plaintiff's claims filed in the Northern District complaint against defendants Rohlfing, Filice, Kreitler, and Acquva were also filed more than four years after the alleged events and omissions occurred.

### 4. CSP-SOL

Plaintiff arrived at CSP-SOL on July 6, 2005, where he was housed until 2009, and again from September through December of 2012, when he was transferred to DVI. (ECF No. 15 at 7, 84.) Plaintiff included Dr. Chen and Dr. Collinsworth in the Northern District complaint. The court now reviews plaintiff's allegations against the doctors at CSP-SOL.

### a. Dr. Naku, Dr. Mahmoud, Dr. Chen, & Dr. Collinsworth

Initially, the undersigned sets forth the factual allegations specifically identified as involving defendants Dr. Naku, Dr. Mahmoud, Dr. Chen, and Dr. Collinsworth, and then evaluates plaintiff's claims in the context of such allegations, taking into account the medical records provided.

### i. Dr. Naku

On August 11, 2005, plaintiff alleges he informed Dr. Naku of the following symptoms: continuous penile pain, bleeding ulcers, and continuing urination problems. (ECF No. 15 at 13,

86 (Ex. Q).)  Dr. Naku documented that plaintiff complained of penile pain, noted that the physical exam was unremarkable, assessed penile pain, noting "?cause." (ECF No. 15 at 86.)  Dr. Naku noted his plan, which included re-evaluating plaintiff in 7 days. (Id.)  On December 20, 2005, Dr. Naku ordered a urinalysis, motrin for pain, and follow-up in 7 days.  (ECF No. 15 at 93.)  On December 28, 2005, plaintiff was seen in the clinic for follow-up regarding his urinary problem.  (ECF No. 15 at 86.)  On December 29, 2005, Dr. Naku ordered a PSA for plaintiff. (ECF No. 15 at 14, 90 (Ex. S).)  On December 29, 2005, plaintiff was seen by Dr. Naku, who documented plaintiff's penile pain at the base of his penis, painful penis urination, and a urination problem.  (ECF No. 15 at 14.)  The medical record from the December 29, 2005 examination notes that plaintiff reported suffering "penile pain for two weeks; pain is intermittent, with no pain on ejaculation or without urination." (ECF No. 15 at 90.)  Plaintiff's pain was at the base of penis; plaintiff has used Ibuprofen but "not sure it helped." (Id.)  Dr. Naku noted that plaintiff had a thrombosed vein on dorsal aspect of penis, assessed as "traumatic." (Id.)  Dr. Naku's plan included "Cipro, motrin, and re-evaluate in 7 days.  If pain not resolved, obtain urology consult." Dr. Naku ordered PSA, AgAIC, PBS, and CBC. (Id.)

Plaintiff alleges that on February 2, 2006, Dr. Naku obtained another PSA blood test, but failed to obtain a urology consult, or order AGAIC, PBS or CBC  tests. (Id., citing Ex. T 1-3.) Plaintiff's PSA was 1.2.  (ECF No. 15 at 95.)  From February 2, 2006, to February 13, 2007, plaintiff alleges that Dr. Naku "failed to medically treat plaintiff although he has high priority and emergency medical needs due to the plaintiff's pain in his penis, bleeding ulcers, and continuing urination problems, and due to the neglect of attention," plaintiff's health worsened, became irritable, his prostate grew larger and his urination problem got worse.  (ECF No. 15 at 14.)

On October 18, 2007, through June 2008, plaintiff alleges that Dr. Naku "failed to medically treat plaintiff although he has high priority and emergency medical needs due to the plaintiff's pain in his penis, bleeding ulcers, and continuing urination problems," which plaintiff claims Dr. Naku did "nothing to assist or assess the serious medical needs of the plaintiff."  (ECF No. 15 at 15.)

ii. Dr. Mahmoud

26

On October 12, 2005, Dr. Mahmoud had plaintiff's urine tested. (ECF No. 15 at 13, 88 (Ex. R).) The following results were noted as "H" or "Out of Range": Serum creatinine, glucose, total cholesterol, triglycerides. (Id. at 88.) Plaintiff alleges that Dr. Mahmoud "failed to medically treat plaintiff although he has high priority and emergency medical needs due to his penis pain, bleeding ulcers, and continuing urination problem." (ECF No. 15 at 14.) Plaintiff alleges that Dr. Mahmoud knew of plaintiff's ongoing serious health problem, yet did nothing to relieve the problem, which contributed to the deterioration of plaintiff's health. (Id.) From February 2, 2006, to February 13, 2007, plaintiff alleges that Dr. Mahmoud's inadequate care for the plaintiff fell below the standard of care, and caused plaintiff to suffer during his stay at CSP-SOL. (ECF No. 15 at 14, 95 (Ex. U).) However, Exhibit U is a PSA test result bearing Dr. Naku's name, and does not mention Dr. Mahmoud. (ECF No. 15 at 95.) Plaintiff alleges that Dr. Mahmoud "failed to medically treat plaintiff although he has high priority and emergency medical needs due to [plaintiff's] penile pain, bleeding ulcers, and continuing urination problems." (ECF No. 15 at 15.) On October 18, 2007, through June 2008, plaintiff claims that Dr. Mahmoud failed to treat plaintiff despite knowing about these serious health problems from test results in plaintiff's medical files, but did not "see to the plaintiff's serious medical problems which worsened" as time passed. (ECF No. 15 at 15, 104-09 (Ex. Y).) None of the documents in Exhibit Y bear Dr. Mahmoud's name. (ECF No. 15 at 104-09.)

### iii. Dr. Chen

On October 15, 2007, Dr. Chen ordered various lab work, including a chem panel, lipid profile, CBC, urinalysis, and a PSA blood test. (ECF No. 15 at 15, 101, 104-05 (Ex. X, & Y).) Plaintiff was prescribed Tylenol 325 mg 1 to 2 per day as needed for two months. (ECF No. 15 at 101.) Plaintiff's PSA was 1.6. (ECF No. 15 at 102, 106.)

On October 18, 2007, through June 2008, plaintiff alleges that Dr. Chen "failed to medically treat plaintiff's serious medical needs after the many tests performed on plaintiff, although plaintiff has high priority and emergency medical needs due to the plaintiff's penile pain, bleeding ulcers, and continuing urination problems." (ECF No. 15 at 15.)

////

iv.  Dr. Collinsworth

On December 30, 2008, Dr. Collinsworth ordered plaintiff a PSA blood test, as well as other lab tests.  (ECF No. 15 at 16, 118 (Ex. BB-1); 114-16.)

v.  Discussion

First, many of plaintiff's claims appear to be barred by the statute of limitations.  Even if all of plaintiff's claims against defendants Dr. Naku, Dr. Mahmoud, Dr. Chen, and Dr. Collinsworth related back to plaintiff's complaint in the Northern District, all of the specific factual allegations took place prior to June of 2008, more than four years prior to the December 13, 2014 filing of the Northern District Complaint.

Second, plaintiff has failed to demonstrate that the course of treatment these doctors chose was medically unacceptable under the circumstances.  Indeed, plaintiff's allegations as to Dr. Naku in 2005 demonstrate that Dr. Naku was diligent and attentive.  Plaintiff's disagreement with the tests Dr. Naku ordered does not rise to the level of deliberate indifference, but rather a difference of opinion.  The factual allegations as to Dr. Mahmoud, Dr. Chen and Dr. Collinsworth do not demonstrate deliberate indifference.  Indeed, providing medical care that falls below the standard of care is negligence, not deliberate indifference.  Plaintiff's repeated conclusory statements that these doctors failed to medically treat plaintiff are not supported by factual allegations.  To the extent plaintiff argues that these doctors neglected plaintiff or failed to properly diagnose plaintiff's medical ailments, such claims are insufficient to state a cognizable civil rights claim.  Accordingly, plaintiff's claims against defendants Dr. Naku, Dr. Mahmoud, Dr. Chen, and Dr. Collinsworth should be dismissed.

b.  Dr. Traquina

Plaintiff identifies Dr. Traquina as a medical doctor and Chief Medical Officer at CSP-SOL, "legally responsible for the supervision of the defendants Dr. Naku, Dr. Mahmoud, Dr. Chen, and Dr. Collinsworth, and also legally responsible for the medical treatment, safety, health and welfare of all inmates" at CSP-SOL.  (ECF No. 15 at 5.)  Plaintiff included no specific factual allegations as to Dr. Traquina.  (ECF No. 15 at 1-21, *passim*.)  At the conclusion of his factual allegations, plaintiff generally alleges that "defendants Naku, Mahmoud, Chen, Traquina, and

Collinsworth failed to medically treat and care for plaintiff's immediate medical emergency needs of his penile suffering and stomach pain, bleeding ulcers, and urinary problems . . . and urinary problems . . . , which ultimately lead the plaintiff to contract cancer of the prostate." (ECF No. 15 at 22.) But plaintiff does not allege that Dr. Traquina was his treating physician, and fails to include charging allegations setting forth a link or connection between Dr. Traquina and plaintiff's medical care. Therefore, because plaintiff has had two opportunities to amend to include allegations against Dr. Traquina, yet includes him solely based on his role as CMO, Dr. Traquina should be dismissed without leave to amend.

c. Group allegations - CSP-SOL

From June 30, 2008, to December 30, 2008, and from December 30, 2008, through May 27, 2009, plaintiff alleges defendants Naku, Mahmoud, Chen and Collinsworth "failed to medically treat and care for plaintiff although [he] has high priority and emergency medical needs due to his continuing penile pain, bleeding ulcers, and continuing pungent feelings during urination which [kept] plaintiff up half the night, due to the inadequate medical care. (ECF No. 15 at 16, citing Ex. AA-1 1-4.) Plaintiff alleges that each of these doctors had the opportunity to review plaintiff's medical files to know plaintiff had a serious medical problem, and "failed to acknowledge the facts of the many PSA tests, urine tests, and any other test that was performed on the plaintiff, and failed to assess the serious medical needs, and neglected to treat plaintiff's continuing complaints," which led to plaintiff's deteriorating medical health, enlarged prostate causing the frequent urination problems, as well as the bleeding ulcers to continue. (ECF No. 15 at 16, 120 (Ex. CC-1).) However, plaintiff's Exhibit CC-1 is a "Problem List;" an entry for June 6, 2009, noted plaintiff's elevated cholesterol levels, and two later entries are for 2010 events.[13] (ECF No. 15 at 120.)

At the conclusion of his factual allegations, plaintiff alleges that "defendants Naku, Mahmoud, Chen, Traquina, and Collinsworth failed to medically treat and care for plaintiff's immediate medical emergency needs of his penile suffering and stomach pain, bleeding ulcers,

---

[13] Plaintiff was transferred to CTF in June of 2009. (ECF No. 15 at 7, 122.)

and urinary problems between 2005 through 2012, and through 2013, and urinary problems between the years of 2005 through 2012, and through 2013, which ultimately lead the plaintiff to contract cancer of the prostate." (ECF No. 15 at 22, citing Ex. VV-1 (not appended).) However, as set forth above, plaintiff was housed at CSP-SOL from 2005 to 2009, and from September through December of 2012. Plaintiff was housed at DVI in 2013. (ECF No. 15 at 7.) He was not housed at CSP-SOL from 2010 through August of 2012. (Id.)

As discussed above, plaintiff's claims arising from medical care provided at CSP-SOL prior to December 13, 2010, or four years prior to the filing of plaintiff's complaint in the Northern District, are barred by the statute of limitations. Plaintiff's repeated conclusory allegations attached to varying time spans do not assist the court in determining whether plaintiff can state cognizable Eighth Amendment claims against the defendant doctors at CSP-SOL. Review of plaintiff's amended complaint in its entirety demonstrates that plaintiff had multiple medical issues, and while housed at DVI, was diagnosed with an overactive bladder and benign prostatic hypertrophy ["BPH"], which could be treated with medication (ECF No. 185 at 188), but which also could have interfered with the proper diagnosis of plaintiff's prostate cancer which was not diagnosed until 2013. But in any event, plaintiff does not adequately allege deliberate indifference based solely on an alleged failure to properly diagnose a medical condition, absent facts showing that a particular doctor knew the proper diagnosis yet disregarded an excessive risk to plaintiff's health and safety by choosing a course of treatment that was medically unacceptable under the circumstances. Plaintiff alleges no facts meeting this high standard.[14]

However, in an abundance of caution, the court grants plaintiff leave to file an amended complaint, provided plaintiff can allege facts demonstrating that defendants Dr. Naku, Dr. Mahmoud, Dr. Chen, or Dr. Collinsworth were deliberately indifferent to plaintiff's serious

---

[14] Plaintiff's Eighth Amendment claims based on his prostate cancer diagnosis are further complicated given the treatment options available to medical professionals: "watchful waiting, active surveillance, surgery, and radiation therapy." (ECF No. 15 at 206.) Plaintiff has chosen active surveillance rather than surgery or radiation therapy. (ECF No. 15 at 197.) "Harms of treatment include erectile dysfunction, urinary incontinence, bowel dysfunction, and a small risk for premature death." (ECF No. 15 at 206.)

medical needs while he was housed at CSP-SOL after December 13, 2010.  Plaintiff is not

granted leave to amend as to Dr. Traquina because there were no charging allegations as to Dr.

Traquina, and his role was supervisory, based solely on a theory of respondeat superior.

### d. Conclusion:  CSP-SOL

Because the bulk of plaintiff's claims based on medical care at CSP-SOL are barred by the

four year statute of limitations, which is clear from the face of the amended complaint, plaintiff is

not granted leave to file Eighth Amendment claims concerning medical care at CSP-SOL prior to

December 13, 2010.  As discussed above, plaintiff is not granted leave to amend as to Dr.

Traquina.  Plaintiff is granted leave to amend as to his Eighth Amendment claims based on

medical care provided by Dr. Naku, Dr. Mahmoud, Dr. Chen, or Dr. Collinsworth, at CSP-SOL

after December 13, 2010.

### 5. DVI[15]

Plaintiff was transferred to and housed at DVI from late 2012 to 2014; he was transferred

to San Quentin on February 27, 2014.  (ECF No. 15 at 7.)  In the complaint filed in the Northern

District, plaintiff included his claims against defendants Dr. Win and Dr. Kim.  Because plaintiff

provided numerous medical records from treatment provided while he was housed at DVI, the

undersigned first sets forth plaintiff's allegations as to the DVI doctors, and then discusses

plaintiff's claims in the context of the medical care provided.

### a. Dr. Win

Plaintiff alleges that Dr. Win "failed to medically treat plaintiff although [he] had high

priority and emergency medical needs due to the pain in his penis, bleeding ulcers, and urination

problems which eventually led to prostate cancer due to the inadequate medical care, and neglect

to treat the plaintiff after countless test results."  (ECF No. 15 at 18.)  On November 2, 2012,

plaintiff alleges Dr. Win had plaintiff's blood tested at CMF.  (ECF No. 15 at 18.)  Dr. Win

---

[15]  Plaintiff also claims that while he was housed at DVI a Dr. "Sugge" failed to treat plaintiff.
(ECF No. 15 at 17; 19.)  However, plaintiff did not name a Dr. Sugge as a defendant either in his
case caption or in the section identifying defendants.  (ECF No. 15 at 1-6.)  Plaintiff also
attributes Dr. Sugge's alleged failure to treat plaintiff from June 28, 2010, through November 2,
2012, while plaintiff was housed at DVI, but such dates do not comport with the 2012-14 dates of
plaintiff's DVI housing described in his pleading.  (ECF No. 15 at 7.)

ordered an occult blood test, which was collected on November 28, 2012, and reviewed on November 30, 2012. (ECF No. 15 at 158.) On June 21, 2013, Dr. Win ordered plaintiff's blood tested at CMF. (ECF No. 15 at 20, citing Ex. MM-1-2 (not appended).) On June 21, 2013, plaintiff's PSA was 1.8. (ECF No. 15 at 200.) Plaintiff alleges that on June 24, 2013, Dr. Win ordered a prostate biopsy. (ECF No. 15 at 20, citing Ex. NN-1, not appended.) However, the health care request form reflects that on June 14, 2013, Dr. Win requested a prostate biopsy, which was approved on June 24, 2013, and performed on July 12, 2013. (ECF No. 15 at 185.) The form also reflects that a CT scan was scheduled for July 17, 2013, and plaintiff was to be seen for follow-up in 2-4 weeks in the CDC Urology Clinic. (Id.) On July 12, 2013, on orders by Dr. Win and approved by Dr. Kim, plaintiff was transferred to the Doctor's Hospital in Manteca for a prostate biopsy. (ECF No. 15 at 20, citing Ex. OO-1.) The biopsy demonstrated a Gleason score 3+3 =6 adenocarcinoma, and there was perineural involvement. (ECF No. 15 at 200.) On July 17, 2013, the CT of plaintiff's abdomen and pelvis demonstrated normal prostate and seminal vesicles. (Id.)

b. Dr. Zheng

Plaintiff alleges that Dr. Zheng "failed to medically treat plaintiff although [he] had high priority and emergency medical needs due his penis pain, bleeding ulcer, and ongoing urination problems, that the defendant's neglect to assess plaintiff's serious medical needs led the plaintiff's health to deteriorate and the cancer to progress in the time that it could have been treated, and was not diagnosed until two years later." (ECF No. 15 at 18, citing Ex. II-19.) On June 12, 2013, Dr. Zheng performed a digital rectal exam, and discovered an induration in the right lobe of plaintiff's prostate, measuring 30g. (ECF No. 15 at 20, citing Ex. PP-1.)

Plaintiff alleges that Dr. Zheng "failed to medically treat plaintiff although [he] had a high priority and emergency needs due to his penile pain and suffering, the undetected bleeding ulcers, and continuing urination problems, that the lack of professional medical care contributed to" the worsening of plaintiff's health. (ECF No. 15 at 19-20.) Dr. Zheng was aware of plaintiff's serious health needs due to the test results, yet failed to assess plaintiff's medical needs, leading to the deterioration of plaintiff's health. (ECF No. 15 at 20, citing Ex. LL 1-11.)

c. Dr. Kim

Plaintiff identifies Dr. Kim as a medical doctor and Chief Medical Officer at DVI, "legally responsible for the supervision of defendants Dr. Win and Dr. Zheng and also legally responsible for the medical treatment, health, safety, and welfare of all inmates" at DVI.  (ECF No. 15 at 6.)  Plaintiff alleges that Dr. Kim "failed to medically treat plaintiff although [he] had high priority and emergency medical needs due to the pain in his penis, bleeding ulcers, and continuing urination problems that from the defendant's neglect the plaintiff eventually got worse," his prostate enlarged and became irritable which turned to cancer due to the lack of medical care."  (ECF No. 15 at 18.)  Plaintiff alleges Dr. Kim was aware of plaintiff's many health problems due to the many test results, yet "did nothing to relieve plaintiff's suffering, which allowed the cancer to progress.  (ECF No. 15 at 19.)  Plaintiff alleges that the prostate cancer diagnosis was delayed for years due "to the unprofessional conduct and neglect of his serious medical health care."  (Id.)  Plaintiff argues that Dr. Kim did not adequately treat plaintiff, which lead to plaintiff's health deteriorating, plaintiff became very ill, and the cancer has become worse due to such neglect.  (Id.)

On July 9, 2013, Dr. Kim, CMO, signed the request for plaintiff's temporary removal for medical treatment.  (ECF No. 15 at 190.)  On July 12, 2013, on orders by Dr. Win and Dr. Kim, plaintiff was transferred to the Doctor's Hospital in Manteca for a prostate biopsy.  (ECF No. 15 at 20, citing Ex. OO-1.)  On July 16, 2013, a pathologist reported that plaintiff has prostate cancer.  (ECF No. 15 at 20, citing Ex. QQ 1-2 (not appended).)  On November 25, 2013, plaintiff's PSA was 2.6.  (ECF No. 15 at 200.)  On December 26, 2013, on a form signed on Dr. Kim's behalf, plaintiff was ordered to be transferred to urology for an appointment on December 30, 2013, at Doctor's Hospital Manteca, Clinic.  (ECF No. 15 at 193.)

d. All of the Defendants at DVI

At the conclusion of his factual allegations, plaintiff alleges that "defendants Win, Kim, and Zheng failed to medically treat and care for the plaintiff's immediate medical emergency needs of his penile and stomach pain and suffering, bleeding ulcers, and urinary problems between the years 2012 thru 2014, which eventually caused the plaintiff to contract prostate

33

cancer due to the neglect and inadequate medical care."  (ECF No. 15 at 22, 172-207 (Ex. WW-1).)

### e. Discussion

As set forth above,

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

Estelle, 429 U.S. at 105-06.  "Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."  Lopez, 203 F.3d at 1131.

After careful review of plaintiff's allegations as to the doctors at DVI, the undersigned finds plaintiff fails to state a cognizable claim that any of the doctors were deliberately indifferent to plaintiff's serious medical needs, for the following reasons.

First, plaintiff concedes that his prostate cancer was not diagnosed until July of 2013.  A defendant cannot be found deliberately indifferent for failing to treat a condition of which he is unaware.

Second, it is unclear what dates Dr. Win and Dr. Zheng served as plaintiff's primary care physicians.  The medical records suggest that other doctors were responsible for plaintiff's primary care when he transferred to DVI.  (ECF No. 15 at 172-75.)  It is also unclear whether Dr. Win and Dr. Zheng served as plaintiff's physician at the same time or at different times.  Indeed, the only specific factual allegation as to Dr. Zheng is that he performed a digital rectal exam on June 12, 2013, which, standing alone, does not evince deliberate indifference.  Plaintiff includes no facts as to what actions or inactions Dr. Zheng took after the exam, but Dr. Win ordered a prostate biopsy shortly thereafter.

Third, from 2012 to 2013, Dr. Win ordered lab tests on numerous occasions, and diligently reviewed the results as indicated by his initials and dates recorded on each result.  (ECF No. 15 at 176-81; 183-84, 191-92.)

Fourth, plaintiff received several outside medical consults while housed at DVI.

On December 31, 2012, plaintiff had a telemedicine consultation with Peter Bretan, M.D., at Palm Drive Hospital in Sebastopol. Dr. Bretan noted plaintiff's primary care physician found a large prostate on exam, which was associated with "severe lower urinary tract symptoms despite alpha blocker therapy with doxazosin." (ECF No. 15 at 182.) Plaintiff reported nocturia q. 5 minutes and during the day q. 10 minutes, with no history of urinary tract infections or elevated PSA. (Id.) "The patient has progressive symptoms past eight to nine years." (Id.) Dr. Bretan recorded plaintiff has a normal comprehensive metabolic panel, urine cultures negative, TSH 3.0 (normal less than 4.0), and serum creatinine 1.1. (Id.) The impression: (1) "benign prostatic hypertrophy ["BPH"], on medications that may be inadequate. He continues to complain of low force urine;" (2) "Overactive bladder secondary to benign prostatic hypertrophy." (Id.) Dr. Bretan's plan was to adjust plaintiff's medication, add additional medications, and schedule follow-up to check symptoms and results from "sono of bladder and kidney checking postvoid residual." (Id.)

Following Dr. Bretan's June 12, 2013 telemedicine consult, he noted plaintiff has overactive bladder, and BPH, which was responding to medical therapy; he discussed the option of surgery, but at this time plaintiff's response to medical therapy was satisfactory. (ECF No. 185 at 188.) Dr. Bretan also noted plaintiff's right prostate induration/nodule measuring about 30 g, and the plan was to repeat PSA and call to set up an "outpatient transrectal ultrasound-guided prostate biopsy." (Id.) Dr. Win requested the biopsy two days later. (ECF No. 15 at 189.)

On June 24, 2013, plaintiff had a consult with Dr. Kisseng Hsieh. (Id. at 200.) Plaintiff's Uroflow maximum flow rate was 70 mL per second with a voided volume of 307 mL and post void residual of 48 mL. (Id.)

On July 16, 2013, a pathologist reported that plaintiff has prostate cancer. (ECF No. 15 at 20.)

On December 30, 2013, plaintiff was in urology at an outside hospital, where Dr. Hsieh performed a digital rectal exam which revealed a nodule at the right apex. (ECF No. 15 at 200.)
////

On September 3, 2014, plaintiff had a comprehensive radiology oncology consult with Dr. Lloyd T. Miyawaki of Marin Specialty Care. (ECF No. 15 at 195-98, 200.) The doctor's impressions were "clinical stage T2cN0M0 Gleason score 4+3=7 adenocarcinoma of the prostate with a PSA of 3.3. He was diagnosed in 2013 and has been on active surveillance." (ECF No. 15 at 197.) Dr. Miyawaki "had an extensive discussion regarding [plaintiff's] diagnosis, prognosis and treatment options." (Id.) "Based on his prognostic factors, [plaintiff] is considered to have intermediate-risk disease. He has a high volume of disease." (Id.) Dr. Miyawaki discussed with plaintiff the option of continued active surveillance, but strongly recommended "definitive therapy based on the adverse features of his disease and his young age." (Id.) Dr. Miyawaki noted Dr. Gershbein discussed surgical options with plaintiff. Dr. Miyawaki discussed with plaintiff the benefits and potential risks of radiation therapy, and recommended multimodality radiation therapy. (Id.) In light of plaintiff's decision not to treat the cancer, Dr. Miyawaki recommended "continued active surveillance with PSA testing every 6 months, DRE testing every 12 months and repeat biopsies every 12 months," and noted plaintiff "may reconsider definitive treatment with progression before he becomes symptomatic." (Id.)

Fifth, as to Dr. Kim, a supervisor cannot be held liable under § 1983 on the theory of respondeat superior. Iqbal, 556 U.S. at 676; see also Jeffers v. Gomez, 267 F.3d 895, 915 (9th Cir. 2001) ("[S]upervisory officials are not liable for the actions of subordinates on any theory of vicarious liability under 42 U.S.C. § 1983."). Thus, any claims based solely on Dr. Kim's supervision of Dr. Win and Dr. Zheng must fail. Moreover, the record reflects that Dr. Kim approved Dr. Win's requests and signed orders for plaintiff's transport to outside consults. Such actions do not evidence deliberate indifference.

Finally, plaintiff sets forth no specific fact demonstrating that Dr. Win, Dr. Zheng, or Dr. Kim acted with a sufficiently culpable state of mind. Rather, it appears plaintiff was provided myriad lab tests, as well as outside medical consults, while he was housed at DVI. Thus, the documents attached to plaintiff's amended complaint contradict plaintiff's conclusory allegations that such doctors failed to provide medical treatment. Wilhelm, 680 F.3d at 1116 n.1; Iqbal, 556 U.S. at 678 (conclusory allegations not supported by factual allegations do not state a plausible

1  claim).  Therefore, plaintiff's claims are dismissed, but plaintiff is granted leave to amend as to

2  his claims concerning medical care at DVI.

3       E.  Newly-Pled State Law Claims

4       For the first time, plaintiff raises state law claims based on medical malpractice or

5  negligence, as well as an alleged failure to warn.  Although the court may exercise supplemental

6  jurisdiction over state law claims, plaintiff must first have a cognizable claim for relief under

7  federal law.  See 28 U.S.C. § 1367; Parra v. PacifiCare of Az., Inc., 715 F.3d 1146, 1156 (9th Cir.

8  2013).  Moreover, the Government Claims Act requires exhaustion of state law tort claims with

9  the California Victim Compensation and Government Claims Board ("Board"), and plaintiff is

10  required to specifically allege compliance in his complaint.  Shirk v. Vista Unified Sch. Dist., 42

11  Cal.4th 201, 208-09 (Cal. 2007); State v. Superior Court of Kings Cnty. (Bodde), 32 Cal.4th

12  1234, 1239 (Cal. 2004).  Failure to demonstrate compliance constitutes a failure to state a cause

13  of action and will result in the dismissal of plaintiff's state law claims.  Id.

14       Because plaintiff's complaint is being dismissed with leave to amend, and plaintiff did not

15  plead his compliance with the Board, the court will not address the viability of plaintiff's

16  allegations supporting his state law claims.  Plaintiff's state law claims are dismissed with leave

17  to amend only if plaintiff can demonstrate he timely complied with the Board's presentation

18  requirement.

19  V.  Leave to Amend

20       In accordance with the above, the court finds that plaintiff's amended complaint must be

21  dismissed; plaintiff is granted leave to file a second amended complaint, as set forth above.

22  If plaintiff chooses to amend, plaintiff must demonstrate how the conditions about which he

23  complains resulted in a deprivation of plaintiff's constitutional rights.  Rizzo v. Goode, 423 U.S.

24  362, 371 (1976). Also, the pleading must allege in specific terms how each named defendant is

25  involved.  Id.  There can be no liability under 42 U.S.C. § 1983 unless there is some affirmative

26  link or connection between a defendant's actions and the claimed deprivation.  Id.; May, 633 F.2d

27  at 167; Johnson v. Duffy, 588 F.2d at 743.  Furthermore, vague and conclusory allegations of

28  ////

official participation in civil rights violations are not sufficient.  <u>Ivey v. Bd. of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982).

Plaintiff may not change the nature of this suit by alleging new, unrelated claims.  <u>See</u> Fed. R. Civ. P. 20(a)(2); <u>George</u>, 507 F.3d at 607.

By signing a second amended complaint, plaintiff certifies he has made reasonable inquiry and has evidentiary support for his allegations, and for violation of this rule the court may impose sanctions sufficient to deter repetition by plaintiff or others.  Fed. R. Civ. P. 11.

In addition, plaintiff is informed that the court cannot refer to a prior pleading in order to make plaintiff's second amended complaint complete.  Local Rule 220 requires that an amended complaint be complete in itself without reference to any prior pleading.  This requirement exists because, as a general rule, an amended complaint supersedes the original complaint.  <u>See</u> <u>Loux v. Rhay</u>, 375 F.2d 55, 57 (9th Cir. 1967).  Once plaintiff files a second amended complaint, the original and amended pleading no longer serve any function in the case.  Therefore, in a second amended complaint, as in an original complaint, each claim and the involvement of each defendant must be sufficiently alleged.

However, plaintiff is not required to re-submit his exhibits.  Any party may refer to the exhibits provided with plaintiff's amended complaint.  (ECF No. 15 at 30-207.)

Plaintiff is cautioned that failure to comply with this order will result in a recommendation that this action be dismissed based on plaintiff's failure to comply with court orders.  Fed. R. Civ. P. 41(b).[16]

Good cause appearing, IT IS HEREBY ORDERED that:

1. Plaintiff's motion to supplement evidence (ECF No. 17) is granted;

2. Plaintiff's amended complaint is dismissed with leave to amend the following claims:

////

_____

[16] "**Involuntary Dismissal; Effect**.  If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it.  Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule -- except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19 -- operates as an adjudication on the merits."  Fed. R. Civ. P. 41(b).

a. Eighth Amendment medical claims based on medical care provided by Dr. Naku, Dr. Mahmoud, Dr. Chen, or Dr. Collinsworth, at CSP-SOL after December 13, 2010;

b. Eighth Amendment medical claims based on medical care provided by defendants Dr. Win, Dr. Zheng, or Dr. Kim at DVI; and

c. Negligence or medical malpractice state law claims based on medical care, provided he can demonstrate timely compliance with the CTCA's presentation requirement.

3. Plaintiff is granted thirty days from the date of service of this order to file a second amended complaint that complies with this order, the requirements of the Civil Rights Act, the Federal Rules of Civil Procedure, and the Local Rules of Practice; the second amended complaint must bear the docket number assigned this case and must be labeled "Second Amended Complaint"; plaintiff must file an original and two copies of the second amended complaint; failure to file a second amended complaint in accordance with this order will result in a recommendation that this action be dismissed.

Further, IT IS HEREBY RECOMMENDED that:

1. Plaintiff's claims concerning allegedly contaminated water, including any state law claims related thereto, against defendants Beard, Runnels, Stanley, Swarthout, Price and Millard be dismissed without prejudice for improper joinder;

2. Plaintiff's Eighth Amendment medical claims against defendants Brown, Rohlfing, Filice, Kreitler, Kraft, and Acquva, arising while plaintiff was housed in HDSP from 2000 to 2005, be dismissed as barred by the statute of limitations;

3. Plaintiff's Eighth Amendment medical claims against defendants Dr. Naku, Dr. Mahmoud, Dr. Chen, and Dr. Collinsworth, arising from medical care provided at CSP-SOL prior to December 13, 2010, be dismissed as barred by the statute of limitations; and

4. Plaintiff's claims against defendant Dr. Traquina be dismissed without leave to amend.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, plaintiff may file written objections with the court and serve a copy on all parties. Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 20, 2018

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

john1313.scr